## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

_____
                                                   :
**DANIEL WHALEY, individually and on behalf** :
**of all others similarly situated,**            : **Case No.** 2:15-cv-12101
                                    **Plaintiff,** :
            **v.**                                 :
                                                   : **Hon.**_____
                                                   :
**HENRY FORD HEALTH SYSTEM,**                      : **Class Action**
                                    **Defendant.** :
_____ :

## COLLECTIVE ACTION COMPLAINT

Daniel Whaley ("Plaintiff"), through his undersigned attorneys, makes the following allegations against Henry Ford Health System ("Defendant") concerning his acts and status upon actual knowledge and concerning all other matters upon information, belief, and the investigation of his counsel:

## NATURE OF THE ACTION

1.      On January 1, 1999, Defendant implemented HR Policy No: 5.06, System-Wide Personal Appearance Standards ("Personal Appearance Standards Policy"). *See* Policy No. 5.06 (Exhibit A).  The Personal Appearance Standards Policy imposes specific personal appearance, grooming, hygiene and dress standards for all of Defendants' employees and requires uniformed employees to perform uncompensated uniform care and maintenance work to meet these standards.  This case seeks to recover wages owed for this unpaid work.

2.     Plaintiff contends that Defendant violated the Fair Labor Standards Act of 1938, 29 U.S.C. §§ 201, *et seq*. ("FLSA") and the Michigan Workforce Opportunity Wage Act, MCL 408.411 *et seq*. ("MWOA"), by knowingly suffering or permitting certain employees to spend "off-the-clock" time maintaining their work uniforms in a clean, hygienic, stain-free, ironed and wrinkle-free condition to satisfy the requirements of Defendant's Personal Appearance Standards Policy. Plaintiff maintains this work is integral and indispensable to the subject employees' jobs for an array of reasons, including the fact that healthcare work places the highest priority on patient safety, infection control and fostering a safe environment in which sick patients can heal.

## JURISDICTION AND VENUE

3.     This Court has jurisdiction over Plaintiff's FLSA claim pursuant to 29 U.S.C. §216(b) and 28 U.S.C. §1331 (federal question jurisdiction).

4.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(a) and 1391(b) because Plaintiff resides in this District, worked for Defendant in this District, and suffered the losses at issue in this District, and because Defendant has significant business contacts within this District and the actions and actions giving rise to Plaintiff's claims occurred in this District.

5.     This Court has CAFA jurisdiction and supplemental jurisdiction over Plaintiff's state law claim, pursuant to 28 U.S.C. §1332(d) and 28 U.S.C. § 1367.

## PARTIES

6.     Plaintiff is an adult citizen of the State of Michigan who resides in Woodhaven, Michigan.  From September 2003 to May 2009, Plaintiff worked as a full-time, non-exempt MRI Technologist at Henry Ford Hospital Main Campus, a Henry Ford Health System facility in Detroit, Michigan.  In May 2009, Plaintiff was transferred to Henry Ford West Bloomfield Hospital in West Bloomfield, Michigan and continued to perform his duties as an MRI Technologist.  In June 2012, Plaintiff was transferred to Henry Ford Wyandotte Hospital in Wyandotte, Michigan.  In October 2012, Plaintiff was transferred back to Henry Ford Hospital Main Campus in Detroit, Michigan where he is still employed as an MRI Technologist.  At all relevant times, Plaintiff was employed on a full-time basis and regularly worked at least 40 hours per workweek.  At all relevant times, Plaintiff wore a clean, hygienic, stain-free, ironed and wrinkle-free uniform to work to comply with Defendant's Personal Appearance Standards Policy and in keeping with his work as a healthcare provider.  Plaintiff's executed consent to sue form is attached hereto.  *See* Consent Form (Exhibit B).

7.     Defendant is a not-for-profit corporation with corporate headquarters in Detroit, Michigan.  During the relevant period, Defendant owned, controlled and managed a network of six hospitals and a network of health centers, medical centers, optometrist's offices, emergency rooms and pharmacies that employ over

3

23,000      people      in      the      Metro-Detroit      area.      *See*

*www.henryford.com/body.cfm?id=37460* (visited May 12, 2015).  Defendant owns

or controls the facilities at issue, employs all individuals covered by Plaintiff's

claims and is responsible for promulgating and enforcing the patient safety,

infection control and Personal Appearance Standards Policy at issue.

## <u>MATERIAL FACTS</u>

A.   **Defendant Adopted A New Personal Appearance
      Standards Policy For All Of Its Medical Facilities On
      January 1, 1999.**

8.      On January 1, 1999, Defendant introduced a new, mandatory System-

Wide Personal Appearance Standards Policy.  *See* Policy No. 5.06 (Exhibit A).

This Policy was intended to promote "The Henry Ford Experience" for patients at

Defendant's facilities by creating a uniform workforce appearance which

"reflect[s] an image of competence and professionalism," as well as helping to

ensure "*compliance in relation to infection control / safety protocols* and other

regulatory requirements of [Defendant's]," and "engage employees in creating a

healthy environment focusing on Patient Care."   *Id.,* at 1 (emphasis added).

Defendant's Personal Appearance Standards Policy promulgated the same dress

and appearance standard for: "all employees, students, volunteers, contractors,

vendors, and others during workdays, weekends, and off hours who work at all

4

Henry Ford Health System business units and locations when they are in their role as an employee of the System." *Id.* (Exhibit A).

9.     The Personal Appearance Standards Policy generally requires Defendant's employees to wear a uniform consisting of a cotton scrub top and scrub bottom in a specific color scheme depending on their position. *Id.,* at 4 (Exhibit A).

10.     The Personal Appearance Standards Policy made it part of the job for all of Defendant's employees to arrive at work each day wearing their assigned uniform, maintained in a "clean," "neat" and "pressed" condition. *Id.,* at 2 (Exhibit A).

11.     Defendant adopted the new Personal Appearance Standards Policy for a variety of reasons, including to: convey the professionalism and competence of employees; simplify its operational activities by providing a single dress and appearance standard; foster the important goals of patient safety and infection control; increase patient satisfaction with Defendant's services; minimize work days lost to illness; avoid increased costs associated with replacement workers; avoid costs associated with hiring an outside vendor to provide clean, hygienic, stain-free, ironed and wrinkle-free uniforms; encourage unity and camaraderie among its employees; and mitigate financial losses owing to nonpayment (by

Medicare or other insurers) for extended hospitalizations or repeat admissions caused by hospital-acquired infections.

12.    Given the importance of infection control and patient safety in a healthcare setting, Defendant could not (and did not) eliminate the requirement that employees arrive for work in a clean, hygienic, stain-free, ironed and wrinkle-free uniform.  Adopting a looser uniform maintenance or appearance standard would have a significant impact on the safety and health of its patients and the profitability of its medical facilities.

13.    The Personal Appearance Standards Policy expressly acknowledges the link between a properly maintained uniform, professionalism, quality of care, patient safety and infection control by explaining that adherence to the Personal Appearance Standards Policy will "support the compliance in relation to infection control/safety protocols" and is intended to "engage employees in creating a healthy environment focusing on Patient Care."  *Id.*, at 1 (Exhibit A).

14.    To further incentivize employees to wear a clean, hygienic, stain-free, ironed and wrinkle-free uniform to work each day, Defendant's Personal Appearance Standards Policy provided that employees could be sent home without pay to change clothes or be subjected to progressive discipline, up to and including termination, for dress and appearance violations.  *Id.,* at 6 (Exhibit A).

15.    Defendant's reservation of the right to issue such strict discipline for appearance and dress code violations supports the proposition that the uniform maintenance standards promulgated in the policy were an integral and indispensible part of its employees' jobs.

16.    Although Defendant's employees occasionally wore protective apparel during certain procedures, these disposable garments were permeable and did not cover the entire body.  As a result, even when protective apparel was used, it was possible for employee's uniforms to become soiled or contaminated with bodily fluids or infectious pathogens.  Further, regardless of whether employees used protective apparel during certain procedures, it did not excuse them from showing up for work in a clean, hygienic, stain-free, ironed and wrinkle-free uniform.  (Exhibit A).

17.    Defendant's Personal Appearance Standards Policy establishes a minimum acceptable level of dress and personal hygiene across all facilities and employees.

18.    Although Defendant caused its employees to arrive at work in clean, hygienic, pressed uniforms, it did not provide them with on-site access to laundry equipment, clean and press their uniforms "in-house" or contract with a vendor to launder and press their uniforms.  As a result, the only option for Defendant's

employees was to spend several "off-the-clock" hours each week, either at home or in a laundromat, properly maintaining their work uniforms.

> **B.     The Importance Of Clean, Hygienic Uniforms In A Healthcare Setting Demonstrates That Uniform Maintenance Is Integral And Indispensable To The Class Members' Jobs.**

19.     Employment in a healthcare setting involves unique issues stemming from the need to maintain a clean and hygienic environment in which people with compromised immune systems and an array of medical problems – including communicable, infectious diseases – can heal.

20.     It is well-known that any healthcare worker's primary charge is to "first do no harm" to the patient.  For instance, nurses typically take the "Practical Nurse Pledge"—which is a modified version of the Hippocratic Oath that physicians take—and reads a follows:

> Before God and those assembled here, I solemnly pledge;
> To adhere to the code of ethics of the nursing profession;
> To co-operate faithfully with the other members of the nursing team and to carryout *[sic]* faithfully and to the best of my ability the instructions of the physician or the nurse who may be assigned to supervise my work;
> I will not do anything evil or malicious and I will not knowingly give any harmful drug or assist in malpractice.
> I will not reveal any confidential information that may come to my knowledge in the course of my work.
> And I pledge myself to do all in my power to raise the standards and prestige of the practical nursing;
> May my life be devoted to service and to the high ideals of the nursing profession.

*See  http://en.wikipedia.org/wiki/Nightingale_Pledge* (accessed May 12, 2015). Hence, nurses and other healthcare professionals have an inherent, intrinsic duty to do no harm to their patients, which unquestionably includes a duty not to spread infection through their clothing.

21.    Studies have shown that soft-surface fabrics like hospital scrubs can harbor bacteria.  For instance, A study of hospital attire published in the August, 2011 *American Journal of Infection Control* (AJIC) reported that more than 60 percent of health workers' uniforms sampled by researchers tested positive for pathogens, including the germs that can cause pneumonia, bloodstream infections and drug-resistant infections such as MRSA.  *See* "Nursing and Physician Attire as Possible Source of Nosocomial Infections," at 555 (Exhibit C).  The researchers collected samples from the sleeves, waists and pockets of 75 registered nurses and 60 doctors at a busy university-based hospital.  *Id.*  Half of the samples tested positive for one or more pathogens.  *Id.*  Potentially dangerous bacteria were isolated from at least one site on 63% of the uniforms.  *Id.*  Of these, 11% were resistant to multiple front-line antibiotics. *Id., at* 558.  This contamination was found to increase over time.  *Id.*  The rate of contamination with multiple drug-resistant organisms was 29% on attire changed every two days, compared with 8% on uniforms changed daily.  *Id.,* at 557.

22.     A November 2011 study in the journal *Infection Control and Hospital Epidemiology* (ICHE), found that home washing machines do not fully eradicate dangerous hospital acquired bacteria like Methicillin-Resistant *Staphylococcus Aureus* ("MRSA") and *Acinetobacter* at lower temperatures. *See* "Effectiveness of Low-Temperature Domestic Laundry on the Decontamination of Healthcare Workers' Uniforms," at 1103 (Exhibit D).

23.     At 104º F, the temperature used in a typical home machine, the washing process killed MRSA, but not *Acinetobacter*. *Id.,* at 1107. Laundry washed at 140º F was found to be free from both MRSA and *Acinetobacter*. *Id.* The study also tested the effectiveness of ironing fabric with a hot iron to kill and eliminate *Acinetobacter* and found this to be an effective intervention. *Id.,* at 1105.

24.     The Association for Professionals in Infection Control and Epidemiology ("APIC") is an international professional organization for infection control and prevention.  Upon information and belief, the APIC Text (2005) established the following guidelines that emphasize the importance of garment care in the hospital setting:

> Contaminated textiles have been known to be a source of large numbers of pathogenic organisms. However, adherence to the U.S. Centers for Disease Control and Prevention (CDC) Environmental Guidelines1 and compliance with the mandated requirements in the Occupational Standards and Health Administration (OSHA) final rule on blood borne pathogens have proven to be effective in keeping the risk of actual disease

10

transmission to either the patient or healthcare worker (HCW) negligible. This impeccable record also exemplifies the importance of the entire laundering process to render textiles safe and suitable for reuse. The key elements in the laundering process include water temperature, type of detergents, disinfectant (i.e., sodium hypochlorite [chlorine bleach]), rinsing, and finishing.

25.     Moreover, standard curriculum texts for nursing students include units on infection, prevention and control that expressly reference relationship between inadequate decontamination and infection outbreaks in a hospital setting:

Decontamination is the collective term used to describe the three important physical processes of cleaning, disinfection and sterilization. Inadequate decontamination has been cited as being responsible for outbreaks of infection in hospital (Wilson 2006).

*See* Peto, Rachel, Chapter 5, "Infection Prevention and Control," excerpt from textbook Mallik, Maggie, *Nursing Knowledge and Practice*. (Exhibit E, at 96-97).

22.     Following this theme, another nursing textbook emphasizes that "[d]isinfection and sterilization of contaminated or infected objects and good hand hygiene diminish and often eliminate microorganisms as potential sources of infection. *See* Chapter 27, "Asepsis and Infection Control," from Taylor, Carol, *Fundamentals of Nursing*, 7th ed. (2011), at p. 668 (Exhibit F).

24.     Additionally, the American Medical Association ("AMA") has noted concerns about the "textile transmission of infections," namely the potential for

infectious pathogens to spread by the casual contact that occurs between patients

and healthcare providers in a hospital setting:

> Lab coats or scrubs can be the source of some serious bacterial hazards like MRSA," said Charles P. Gerba, Ph.D., a professor of Environmental Microbiology in the Department of Microbiology and Immunology at the University of Arizona. "When doctors or nurses lean over the beds of patients who are carrying organisms, their clothing can become contaminated. Hours later that bacteria can still be alive and passed on through incidental contact with other patients.

> Hospitals continue to make process and procedural improvements in an effort to reduce the number of accidents resulting from bacterial cross-contamination from dirty catheters and other equipment, but clothing has been largely ignored -- until now.

See "AMA Weighs Infection Hazard Posed by Medical Clothing",

http://www.wthr.com /story/12681273/ama-weighs-infection-hazard-posed-by-

medical-clothing (accessed May 12, 2015) (Exhibit G).

25.    Even as recently as May 27, 2015, APIC has been advertising the fact

that "[i]n 2014, we had one of the most challenging years on record in infection

prevention.  Ebola was front and center, commanding an immediate, all out counter

offensive to ensure that every hospital was prepared to identify and isolate a person

with suspected Ebola.  It's now 2015, only five months into the year, and we're

already facing a measles resurgence in the U.S., deaths from listeria outbreaks, and

contaminated endoscopes, while Ebola, though officially contained, continues to lurk in the shadows." *See* May 27, 2015 APIC E-mail (Exhibit H).

26.  As explicitly or implicitly recognized by Defendant's Personal Appearance Standards Policy and all these texts, Defendant's employees' duties put them in direct contact with a wide variety of infectious pathogens and bodily fluids on a regular basis.

27.  When such contact occurs, infectious pathogens can not only contaminate and survive on uniforms but, if left untreated, can rapidly multiply and transmit infection from the contaminated uniforms to patients, visitors, co-workers, and other surfaces in the facility.

28.  Recent examples demonstrating the extreme seriousness of the transmission of infectious pathogens include the MERS outbreak in 2012, the Ebola outbreak in 2014 and the Avian Flu outbreak in 2013-2014, all of which stemmed from the uncontrolled transmission of infectious pathogens, resulted in hundreds of deaths and were only controlled by world-wide mediation and prevention efforts.

29.  The failure to adequately control infection pathways in a healthcare setting creates both direct risks—like the transmission of infectious pathogens to previously-uninfected individuals—and indirect risks—like reduced productivity

due to employee absence, staffing and scheduling problems and financial losses resulting from non-payment for extended or repeat hospitalizations.

30.     For all these reasons, and others, Defendant placed the highest priority on patient safety and infection control throughout its medical facilities and paid very careful attention, both to the uniforms its employees wore and how they maintained these uniforms.

31.     For all these reasons, and others, Defendant could not possibly provide adequate patient care, ensure the safety of its patients and employees, or avoid the various risks and problems identified above without maintaining a policy that required its employees to show up for work in a clean, hygienic, stain-free, ironed and wrinkle-free uniform.

32.     For all these reasons, and others, the time Defendant's employees spend to maintain their work uniforms in clean, hygienic, stain-free, ironed and wrinkle-free condition is a necessary, inherent and integral part of their jobs.

33.     Additionally, the implementation materials for Defendant's Personal Appearance Standards Policy stress that wearing identical, clean, hygienic, stain-free, ironed and wrinkle-free uniforms conveys a sense of professionalism to patients, prospective patients and their families, suggesting a strong link between Defendant's Personal Appearance Standards Policy, its revenues and profitability.

C. **The Importance Of Ironing In A Healthcare Setting Demonstrates That Uniform Maintenance Is Integral To The Class Members' Jobs.**

34.    While the care labels on uniforms worn by Defendant's employees provided "warm iron if desired," this was not part of Defendant's Personal Appearance Standards Policy, or the standard that applied to their uniform maintenance efforts.

35.    Defendant's Personal Appearance Standards Policy and its implementing materials specifically provided that all employees had to show up for work each day in a uniform that was "pressed."

36.    The words "pressed" and "ironed" are interchangeable when used in this context, and both necessarily mean that the uniform garments at issue required ironing in addition to the washing and drying process.  Put another way, the only way to produce a "pressed" set of cotton hospital scrubs that would comply with Defendant's Personal Appearance Standards Policy and reliably avoid discipline for dress or appearance violations, is to iron them.

37.    Ironing work uniforms is an integral part of Defendant's employees' jobs because, while the wash and dry cycles of residential laundry machines kill some infectious pathogens, the direct application of high heat from ironing is a very effective method for eradicating any pathogens that survive the dryer cycle where heat is applied only indirectly.  *See* Exhibit D.

38.    Thus, by ironing their uniforms, Defendant's employees were performing important job functions that included: fostering patient safety and infection control, conveying their professionalism and competence, increasing patient satisfaction with their services, increasing productivity by minimizing work days lost to illness, helping Defendant avoid the increased cost of replacement workers, helping Defendant avoid costs associated with hiring a uniform cleaning vendor and mitigating financial losses owing to nonpayment (by Medicare or other insurers) for extended or repeat hospitalizations.

> **D.     Defendant Knew That Its Employees Spent Time Maintaining Their Uniforms To Comply With The Personal Appearance Standards Policy.**

39.    Defendant knew that its employees routinely spent "off-the-clock" time maintaining their uniforms in clean, hygienic, stain-free, ironed and wrinkle-free condition because it was aware of the patient safety and infection control issues described above and promulgated the Personal Appearance Standards Policy to address them.

40.    Defendant knew that its employees routinely spent "off-the-clock" time maintaining their uniforms in clean, hygienic, stain-free, ironed and wrinkle-free condition because its supervisors and managers routinely observed employees wearing uniforms that complied with the applicable dress and appearance standards.

41.     Defendant knew that its employees routinely spent "off-the-clock" time maintaining their uniforms in clean, hygienic, stain-free, ironed and wrinkle-free condition because it did not provide them with laundry or ironing facilities or equipment during work hours or at their job sites or provide cleaning and pressing services through an outside vendor.

42.     Defendant knew that its employees routinely spent "off-the-clock" time maintaining their uniforms in clean, hygienic, stain-free, ironed and wrinkle-free condition because its supervisors and managers were trained to instruct employees to meet this standard to comply with the Personal Appearance Standards Policy.

43.     Despite this knowledge, Defendant did not provide its uniformed employees with on-site access to laundry equipment, arrange to clean and press their uniforms "in-house" or contract with a vendor to launder and press their uniforms.

44.     Despite this knowledge, Defendant did not implement or enforce sufficient procedures to ensure that the "off-the-clock" time its employees spent complying with the Personal Appearance Standards Policy was properly tracked.

45.     Defendant did not implement or enforce sufficient policies or procedures to ensure that its employees were paid any wages for the "off-the-

clock" time they spent complying with Defendant's Personal Appearance Standards Policy.

> **E.   Complying With Defendant's Personal Appearance Standards Policy Took Between Two and Three "Off-The-Clock" Hours Per Week.**

46.   Plaintiff is personally familiar with, and was personally affected by, the patient safety, infection control, dress code and appearance policies at issue here.

47.   During the relevant period, Plaintiff worked as an MRI Technologist for Defendant in Michigan.  Plaintiff generally worked at least 40 hours per week, not including time spent on uniform maintenance activities.   See Exhibit I, Paystubs.

48.   Plaintiff wore a work uniform consisting of cotton scrub tops and bottoms of any color for each of his assigned shifts, and all extra or overtime shifts from 2003 to 2013.  In 2013, Plaintiff began wearing a uniform of navy blue cotton scrub tops and bottoms.

49.   As an MRI Technologist, Plaintiff's work duties regularly included direct contact with patients, visitors and other employees in Defendant's facilities. Plaintiff's job duties included: preparing patients for MRI scans, transferring patients from their beds to the MRI table, setting up monitoring equipment for intensive care unit patients, injecting patients with contrast dyes, handling patients'

bodily fluids, ensuring patient safety, checking patients' vital signs, monitoring them for changes in their overall health and behavior and providing other patient care.

50.    At any given time during the relevant period, Plaintiff owned about five pairs of cotton hospital scrubs, consisting of a top and a bottom.  Plaintiff always stored, cleaned and ironed his work uniforms separately from his other clothes for infection control purposes.

51.    On average, because of his work schedule and the nature of his work, Plaintiff had to clean, dry and iron five scrub sets each week.  Plaintiff typically spent about three hours once a week washing and ironing his uniforms.

52.    Plaintiff's uniform maintenance routine typically involved spending about 5-10 minutes collecting his scrubs, examining them for stains, pre-treating stains as needed and placing them in the washer.  Plaintiff's washer cycle ran about 60 minutes and his dryer cycle ran about 60 minutes.  When Plaintiff took his uniforms out of the dryer, they were always wrinkled.  To remove the wrinkles, Plaintiff took his uniforms to his bedroom and ironed them.  It took him about 5-10 minutes to iron each scrub top and 7-8 minutes to iron each scrub bottom.

53.    During the relevant period, Plaintiff has earned a straight-time rate of approximately $26.49 per hour and an overtime premium rate of about $39.74 per hour.  Since 2003, Defendant has paid Plaintiff at an overtime rate for hours

beyond 40 each week, but has never paid any wages for the time Plaintiff spent cleaning, drying, or ironing his work uniforms to comply with Defendant's Personal Appearance Standards Policy.

54.    For example, on average, Plaintiff spent three overtime hours per week performing "off-the-clock" uniform maintenance activities which would have cost Defendant $119.22 per week.  If Plaintiff worked an average of 50 weeks per year, this work would have cost Defendant $5,961 per year.  Over the three-year limitation period provided by the FLSA and MWOA, Plaintiff's uniform maintenance work would have cost Defendant approximately $17,883 (or $35,766 under the FLSA's liquidated damages provision).

55.    Had Defendant provided clean, hygienic, stain-free, ironed and wrinkle-free uniforms for its employees through an "in-house" laundry service or an outside vendor, Plaintiff could have used the three hours per week he spent doing this work in any manner he chose.

56.     From the face of the Personal Appearance Standards Policy, his discussions with managers and co-workers, and his observation of Defendant's other uniformed employees during the relevant period, Plaintiff believes the same Personal Appearance Standards Policy applied to all of Defendant's uniformed employees.

57.     Because it was an inherent part of their job and to provide a safe environment for patients, maintain a professional appearance, avoid discipline–and all the other reasons discussed above–Plaintiff believes that all of Defendant's uniformed employees routinely spent 2-3 hours of "off-the-clock" time each week maintaining their uniforms in clean, hygienic, stain-free, ironed and wrinkle-free condition.

58.     As a result of Defendant's conduct, its employees have been regularly deprived of wages owed for the "off-the-clock" time they spent maintaining their uniforms in clean, hygienic, stain-free, ironed and wrinkle-free condition to comply with Defendant's Personal Appearance Standards Policy.

59.     As a result of its conduct, Defendant has improperly retained money it should have paid as wages to its employees for time they spent maintaining their uniforms.  By retaining this money, Defendant has received an inequitable windfall through, *inter alia*, reduced labor and operations costs and enhanced profit margins.

## FLSA COLLECTIVE ACTION ALLEGATIONS

60.     Each of the preceding paragraphs is incorporated by reference as though fully set forth herein.

61.     Plaintiff brings his FLSA claim as a collective action under 29 U.S.C. §216(b) on behalf the following similarly-situated collective group:

> All people who have worked as full-time, hourly, uniformed employees for Defendant in any workweek in the past three years who had direct patient care responsibilities and spent unpaid "off-the-clock" time maintaining their uniforms pursuant to Defendant's Personal Appearance Standards Policy.

Upon information and belief, this collective group includes, but is not limited to: Anesthesia Techs, Cardiac Techs, CAT Scan Technologists, CGNAs, CNAs, GNAs, Hospitality Aides, Interventional Technologists, LPNs, Mammographers, Medical Assistants, MRI Technologists, Nurse Aides, Physical Therapists, Respiratory Techs, Restorative Aides, RNs, STNAs and Ultrasound Technologists. Salaried and other exempt personnel are expressly excluded from this collective group.  Plaintiff reserves the right to amend this definition as necessary.

62.    Plaintiff is a member of the collective group defined above, because he worked as a full-time MRI Technologist for Defendant during the relevant period, had direct patient care responsibilities, was covered by Defendant's Personal Appearance Standards Policy, and regularly spent unpaid "off-the-clock" time cleaning, maintaining and ironing his work uniforms.

63.    Although Plaintiff and the collective group members may have worked in different medical facilities, in different departments, or under different supervisors, this action may be properly maintained as an FLSA collective action because:

(a)    Defendant employed all of the collective group members;

22

(b)     All of the collective group members were governed by the Personal Appearance Standards Policy described herein;

(c)     All of the collective group members wore the same uniform, namely cotton scrub tops and bottoms in designated colors;

(d)     All of the collective group members had to show up for each shift in a clean, hygienic, stain-free, ironed and wrinkle-free uniform to make their jobs safer, more efficient and more productive;

(e)     Defendant expected all of the collective group members to place the highest priority on patient safety, infection control and professionalism;

(f)     Defendant maintained common timekeeping systems and policies with respect to Plaintiff and the collective group members;

(g)     Defendant maintained common hours of work, overtime and compensation policies with respect to Plaintiff and the collective group members;

(h)     Defendant maintained common payroll systems and policies with respect to Plaintiff and the collective group members; and

(i)     Defendant provided all of the collective group members with common training concerning patient safety, infection control and the Personal Appearance Standards Policy;

(j)     All of the collective group members regularly spent "off-the-clock" time complying with Defendant's Personal Appearance Standards Policy;

(k)     Defendant did not maintain contemporaneous records of the "off-the-clock" time Plaintiff and the collective group members spent cleaning and ironing their work uniforms, or cause Plaintiff and the collective group members to maintain such records;

(l)     Defendant did not pay Plaintiff or the collective group members any wages for the "off-the-clock" time they spent cleaning and ironing their work uniforms;

23

(m)    Defendant's labor relations and human resources systems were centrally-organized and controlled and shared a common management team that controlled the policies at issue here.

64.    Plaintiff estimates that the collective group, including both current and ex-employees of Henry Ford Health System over the relevant period, will include several thousand members.  The precise number of collective group members should be readily ascertainable from a review of Defendant's personnel, scheduling, time, and payroll records.

## MICHIGAN CLASS ACTION ALLEGATIONS

65.    Each of the preceding paragraphs is incorporated by reference as though fully set forth herein.

66.    Plaintiff's MWOA claim is brought as a class action pursuant to Fed. R. Civ. P. 23(b)(2) and (b)(3) on behalf of a putative class defined as follows:

> All Michigan residents who have worked as full-time, hourly, uniformed employees for Defendant in any workweek in the past three years who had direct patient care responsibilities and spent unpaid "off-the-clock" time maintaining their uniforms pursuant to Defendant's Personal Appearance Standards Policy

Upon information and belief, this putative Class includes, but is not limited to: Anesthesia Techs, Cardiac Techs, CAT Scan Technologists, CGNAs, CNAs, GNAs, Hospitality Aides, Interventional Technologists, LPNs, Mammographers, Medical Assistants, MRI Technologists, Nurse Aides, Physical Therapists, Respiratory Techs, Restorative Aides, RNs, STNAs and Ultrasound Technologists.

24

Salaried and other exempt personnel are excluded from the putative Class. Plaintiff reserves the right to amend this definition as necessary.

67.     Plaintiff is a member of the putative Class defined above because he is resident of Michigan, worked as a full-time MRI Technologist for Defendant during the relevant period, had direct patient care responsibilities, was covered by Defendant's Personal Appearance Standards Policy and regularly spent "off-the-clock" time cleaning, maintaining and ironing his work uniforms.

68.     The members of the putative Class are so numerous, in the hundreds if not thousands, that joinder of all its members would be impractical.

69.     Any issues that affect individual Class members are overwhelmed by an array of predominantly common questions, including:

   (a)     Whether Defendant employed the putative Class members;

   (b)     Whether all of the putative Class members were governed by the Personal Appearance Standards Policy;

   (c)     Whether all of the putative Class members wore materially identical uniforms, namely cotton scrub tops and bottoms in designated colors;

   (d)     Whether all of the putative Class members had to show up for each shift in a clean, hygienic, stain-free, ironed, and wrinkle-free uniform to make their jobs safer, more efficient, and more productive;

   (e)     Whether Defendant expected all of the putative Class members to place the highest priority on patient safety, infection control, and professionalism;

(f)     Whether Defendant maintained common timekeeping systems and policies with respect to Plaintiff and the putative Class members;

(g)     Whether Defendant maintained common hours of work, overtime and compensation policies with respect to Plaintiff and the putative Class members;

(h)     Whether Defendant maintained common payroll systems and policies with respect to Plaintiff and the putative Class members;

(i)     Whether Defendant provided the putative Class members with common training concerning patient safety, infection control and the Personal Appearance Standards Policy;

(j)     Whether the putative Class members regularly spent unpaid "off-the-clock" time complying with Defendant's Personal Appearance Standards Policy;

(k)     Whether Defendant maintained contemporaneous records of the time Plaintiff and the putative Class members spent cleaning and ironing their work uniforms;

(l)     Whether Defendant paid Plaintiff or the putative Class members any wages for the "off-the-clock" time they spent cleaning and ironing their work uniforms;

(m)     Whether Defendant's labor relations and human resources systems were centrally-organized and controlled and shared a common management team that controlled the policies at issue here.

(n)     Whether the Court should enjoin Defendant from failing to pay its employees for time they spend performing uniform maintenance work.

70.     Plaintiff's claim is typical of the claims belonging to the Class members in that they all suffered damages as a direct and proximate result of Defendant's Personal Appearance Standards Policy and related practices.

26

71.    Plaintiff's claim arises from the same policies, practices and courses of conduct as all other Class members' claims and Plaintiff's legal theories are based on the same legal theories as all other Class members.

72.    Plaintiff will fully and adequately protect the interests of the Class and has retained counsel who are qualified and experienced in the prosecution of wage and hour class actions under state law.  Plaintiff and his attorneys do not have any conflict of interest with the Class members.

73.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy, because, it is not economically feasible for each Class member to retain counsel for an individual lawsuit to recover the wages at issue.  Moreover, prosecution of this case as a class action will eliminate the possibility of duplicative lawsuits being filed in other state and/or federal jurisdictions and minimize the Class members' concerns about retaliation by Defendant.

74.    This case will be manageable as a class action.  Plaintiff's attorneys are well-versed in the management of complex class action cases and, after investigation into the relevant facts and circumstances, do not believe this case presents any particularly unusual circumstances that would render it unmanageable.  Moreover, Defendant maintains computerized timekeeping and

compensation systems that will allow the issues in this case to be discovered and damages to be calculated with relative ease.

75.     Class certification is appropriate under to Rule 23(b)(2) because Defendant has both acted and refused to act on grounds that apply equally to all Class members and because of the propriety of declaratory relief in this case.. *See Shady Grove Orthopedic Assoc., P.A. v. Allstate Ins. Co*., 130 S. Ct. 1431, 1437 (2010) ("[b]y its terms [Rule 23] creates a categorical rule entailing a plaintiff whose suit meets the specified criteria to pursue his claim as a class action").

## COUNT I
## Violation of the FLSA

76.     Each of the preceding paragraphs is incorporated by reference as though fully set forth herein.

77.     Defendant is an "enterprise" as defined by 29 U.S.C. § 203(r)(1), and is engaged in commerce or in the production of goods for commerce within the meaning of 29 U.S.C. § 203(s)(1)(A).

78.     At all times relevant to this action, Defendant "suffered or permitted" Plaintiff to work and thus "employed" him within the meaning of the FLSA, 29 U.S.C. § 203(g).

79.     Plaintiff and the collective group members are similarly-situated individuals within the meaning of the FLSA, 29 U.S.C. § 216(b).

80.     Throughout the relevant period, Defendant was obligated to comply with the FLSA's requirements, Plaintiff and the collective group members were covered employees entitled to the FLSA's protections and Plaintiff and the collective group members were not exempt from receiving wages required by the FLSA for any reason.

81.     29 U.S.C. § 207(a)(1) states that an employee must be paid an overtime premium rate, equal to at least 1½ times his or her regular rate of pay, for all hours worked in excess of 40 per week.

82.     29 U.S.C. § 211(c) requires employers to keep all payroll records and time records for at least three years, including all basic timecards and daily start/stop times for each employee.

83.     Throughout the relevant period, Defendant violated the FLSA by willfully suffering or permitting Plaintiff and the collective group members to spend "off-the-clock" time maintaining their work uniforms in clean, hygienic, stain-free, ironed and wrinkle-free condition to make their jobs safer, more efficient and more productive without either tracking this time or paying any wages for it.

84.     Plaintiff and the collective group members have been harmed as a direct and proximate result of Defendant's unlawful conduct, because they have been deprived of wages owed for time they spent complying with Defendant's

Personal Appearance Standards to make their jobs safer, more efficient and more productive.

WHEREFORE, Plaintiff respectfully prays for an Order:

(a) Requiring Defendant to provide a list of the names, addresses, phone numbers and e-mail addresses of the collective group members;

(b) Authorizing Plaintiff's counsel to issue an approved form of notice informing the collective group members of the nature of the action and their right to join this lawsuit;

(c) Appointing Bryan Yaldou of The Law Offices of Bryan Yaldou, PLLC, Lance C. Young and Neil B. Pioch of Sommers Schwartz, P.C. and David Cohen of Kolman Ely, P.C. as counsel for the collective group;

(d) Declaring that Defendant willfully violated the applicable overtime provisions of the FLSA by failing to pay all required wages to Plaintiff and the collective group members and granting an injunction prohibiting Defendant from continuing to violate the FLSA on this basis;

(e) Granting judgment in favor of Plaintiff and the collective group members on their FLSA claim;

(f) Awarding compensatory damages to Plaintiff and the collective group members in an amount to be determined;

(g) Awarding liquidated damages to Plaintiff and the collective group members equal to their compensatory damages;

(h) Awarding all costs and a reasonable attorney's fees for the work required to prosecute this claim;

(i) Awarding any further relief the Court deems just, equitable and proper;

(j) Enjoining Defendant against any further wage violations on the terms described above; and

    (k)    Granting leave to add additional case Plaintiff by motion, the filing of written consent forms, or any other method approved by the Court.

## COUNT II
## Violation of the Michigan MWOA

85.    Each of the preceding paragraphs is incorporated by reference as though fully set forth herein.

86.    At relevant times, Plaintiff and all members of the Class were employees of the Defendant within the meaning of applicable Michigan wage and hour laws mandating the payment of overtime, including the Michigan Workforce Opportunity Act, MCL 408.411 *et seq.*[1]

87.    MCL 408.412(c) defines "Employee" as: "an individual not less than 16 years of age employed by an employer on the premises of the employer or at a fixed site designated by the employer…."

88.    MCL 408.412(d) defines "Employer" as: "a person, firm, or corporation… who employs 2 or more employees at any 1 time within a calendar year.  An employer is subject to this act during the remainder of that calendar year."

---

[1] Michigan's Minimum Wage Law, Public Act 154 of 1964, as amended, was repealed by the Workforce Opportunity Wage Act, Public Act 138 of 2014.  Public Act 154 of 1964, Michigan Minimum Wage Law  was effective from August 28, 1964 through May 26, 2014.  Public Act 138 of 2014, Workforce Opportunity Wage Act was made effective May 27, 2014.  *See* http://www.michigan.gov/lara/0,4601,7-154-61256_11407_59886_27909-40330--,00.html (accessed May 12, 2015).

89.    With respect to the payment of overtime, MCL 408.414(a)(1) provides that: "Except as otherwise provided in this act, an employee shall receive compensation at not less than 1-1/2 times the regular rate at which the employee is employed for employment in a workweek in excess of 40 hours."

90.    MCL 408.419(1) permits civil actions to recover unpaid overtime wages,  provides a three-year limitations period for such claims and provides for the recovery of liquidated damages and counsel fees and costs in such actions:

> If an employer violates this act, the employee affected by the violation, at any time within 3 years, may do any of the following:
>
> (a)    Bring a civil action for the recovery of the difference between the amount paid and the amount that, but for the violation, would have been paid the employee under this act and an equal additional amount as liquidated damages together with costs and reasonable attorney fees as are allowed by the court.

91.    At all relevant times, Defendant was the employer of Plaintiff and the Class members within the meaning of the MCL.

92.    At all relevant times, Defendant was required to pay Plaintiff and the Class members at least 1-1/2 times their regular rate pf pay for all hours beyond 40 per week.

93.     Michigan has not expressly adopted the Portal-to-Portal Act, 29 U.S.C. § 251, *et seq*., either through statute or common law, so Plaintiff's MWOA claim provides relief above and beyond that afforded by the FLSA.

WHEREFORE, Plaintiff respectfully prays for an Order:

(a)     Requiring Defendant to provide a list of the names, addresses, phone numbers and e-mail addresses of the putative Class members;

(b)     Authorizing Plaintiff's counsel to issue an approved form of notice informing the putative Class members of the nature of the action and their right to opt out of the Class;

(c)     Appointing Bryan Yaldou of The Law Offices of Bryan Yaldou, PLLC, Lance C. Young and Neil B. Pioch of Sommers Schwartz, P.C. and David Cohen of Kolman Ely, P.C. as counsel for the putative Class members;

(d)     Declaring that Defendant willfully violated the applicable overtime provisions of the MWOA by failing to pay all required wages to Plaintiff and the collective group members and granting an injunction prohibiting Defendant from continuing to violate the MWOA on this basis;

(e)     Granting judgment in favor of Plaintiff and the Class on their MWOA claim;

(f)     Awarding compensatory damages to Plaintiff and the Class in an amount to be determined;

(g)     Awarding liquidated damages to Plaintiff and Class members equal to their compensatory damages;

(h)     Awarding all costs and a reasonable attorney's fees for the work required to prosecute this claim;

(i)     Enjoining Defendant against any further wage violations on the terms described above; [2] and

(j)     Awarding any further relief the Court deems just, equitable and proper.

Respectfully submitted,

Dated: June 9, 2015

/s/Neil B. Pioch
Lance C. Young (P51254)
Neil B. Pioch (P67677)
SOMMERS SCHWARTZ, P.C.
One Towne Square, 17th Floor
Southfield, MI  48076
(248) 355-0300

Bryan Yaldou (P70600)
THE LAW OFFICE OF BRYAN YALDOU, PLLC
23000 Telegraph
Brownstown Twp., MI 48134
(734) 692-9200

David J. Cohen (PA 74070)
KOLMAN ELY, P.C.
414 Hulmeville Avenue
Penndel, PA 19047
(215) 750-3134

*Counsel for Plaintiff and the Putative Class and Collective Group*

---

[2] Although Michigan law has not addressed the issue, several other states (including Arkansas, Florida, Massachusetts, Minnesota, New York, Rhode Island and Utah) afford such a remedy against continuing violations in their respective wage and hour laws. *See, e.g.,* Ark. Code Ann. 11-4-218(e)(1); Fla. Const. art. X, section 24(e) (for minimum wage violations); Mass. Gen. Laws Ch. 149, section 150; Minn. Stat. 181.171, subd. 1; 2010 N.Y. Slip op. 32166U, at *10; R. I. Gen. Laws 28-14-19.2(a); and Utah Code Ann. 34-40-205 (for minimum wage violations).